**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| HOPE HARBOR, a Michigan nonprofit corporation, BMAK CHARITY THRIFTS, a Michigan nonprofit corporation, MELISSA DESJARDIN, | Case No. _____ |
| Plaintiffs, | Hon. _____<br>United States District Judge |
| v. | Hon. _____<br>United States Magistrate Judge |
| CITY OF HILLSDALE, MICHIGAN, | |
| Defendant. | |

**<u>VERIFIED COMPLAINT AND JURY DEMAND</u>**

**Table of Contents**

*INTRODUCTION* ................................................................................................................................3

*PARTIES* ..........................................................................................................................................11

*JURISDICTION AND VENUE* .........................................................................................................12

*FACT ALLEGATIONS*.....................................................................................................................12

　Background on BMAK, HOPE Harbor and the Need for Recovery Housing ........................12

　BMAK, HOPE Harbor, and Camp Hope .............................................................................15

　Success of Camp Hope and HOPE Harbor's Services..........................................................18

　Early Awareness and Initial Tolerance (2023-2024)............................................................19

　The City's Enforcement Campaign Begins (Late 2024) ......................................................21

　Forced Closure and Demolition of Camp Hope (2025) .......................................................22

　The City Refuses to Permit the Permanent Building............................................................29

　The City's Failure to Address its Obligations Under Federal and State Fair Housing and Disability Rights Laws39

　Disparate Treatment: The City Permits Similar and More Intensive Uses  While Denying HOPE Harbor its Request for a Reasonable Accommodation.........................................................................................46

　Pretextual Reasons and Selective Enforcement ..................................................................50

*INJURIES TO PLAINTIFFS*.............................................................................................................51

　Injuries to HOPE Harbor and BMAK .................................................................................51

　Injuries to Melissa DesJardin .............................................................................................55

　Injuries to HOPE Harbor Residents ....................................................................................56

*COUNT I*...........................................................................................................................................59

　Discrimination in Making Housing Unavailable 42 U.S.C. § 3604(f)(1) ............................59

*COUNT II*.........................................................................................................................................59

　Discrimination in Terms, Conditions, and Privileges. 42 U.S.C. § 3604(f)(2) .........................59

*COUNT III*.......................................................................................................................................60

　Refusal to Make Reasonable Accommodations 42 U.S.C. § 3604(f)(3)(B) .............................60

*COUNT IV* .......................................................................................................................................62

　Interference, Coercion, and Intimidation 42 U.S.C. § 3617.................................................62

*COUNT V*.........................................................................................................................................63

　Violation of Title II of the Americans with Disabilities Act 42 U.S.C. §§ 12131-12132.......................63

*COUNT VI* .......................................................................................................................................66

　Violation of Michigan Persons with Disabilities Civil Rights Act, MCL §§ 37.1301-1303 ..................66

*COUNT VII*......................................................................................................................................68

　Violation of Michigan Persons with Disabilities Civil Rights Act, MCL §§  37.1602...........................68

Plaintiffs HOPE Harbor, BMAK Charity Thrifts, and Melissa DesJardin, (hereinafter "Plaintiffs"), by and through their attorneys, state the following in support of their Verified Complaint against Defendant City of Hillsdale, Michigan:

## INTRODUCTION

1. In Hillsdale County, Michigan, the opioid crisis has devastated families and communities, just as it has across Michigan and across the United States. Indeed, Hillsdale County is ranked among the most vulnerable of all Michigan Counties regarding substance use and for drug overdose deaths.[1] Moreover, there is a well-documented nexus nationwide between substance use disorder—alcohol and drug addiction—and homelessness.[2] And it is well understood that providing stable housing for the homeless reduces crime and drug use.[3] In 2023, the City of Hillsdale reacted to its population of approximately 80 homeless individuals not by funding or supporting resources to address homelessness, but by banning overnight camping on its public lands. This enactment created an immediate crisis for how to support these individuals.

2. Against this backdrop of crisis, Melissa DesJardin began a grassroots effort to provide safe, supportive housing for persons experiencing homelessness and recovering from substance use disorders. Since late 2018, she had been running a nonprofit thrift shop, BMAK Charity Thrifts, that provides clothing, food, and other services to many of the homeless residents of the City of Hillsdale. Then in 2023, with the impending ban of camping on public lands in the city, DesJardin and her colleagues at BMAK invited people with disabilities, including substance

---

[1] Michigan Overdose Data to Action Dashboard, available at http://bit.ly/473LaRz (last visited March 15, 2026).

[2] See, e.g. "Co-occurring substance abuse and mental health problems among homeless persons: Suggestions for research and practice", National Institutes of Health, Policin D. available at https://pmc.ncbi.nlm.nih.gov/articles/PMC4833089/ (last visited March 15, 2026).

[3] See, e.g. "Safe places and safe sleeping," Brookings Institute, available at https://www.brookings.edu/articles/safe-places-and-safe-sleeping-cost-effective-and-humane-recommendations-for-local-leaders-after-grants-pass/ (last visited March 19, 2026).

3

use disorder, to come pitch their tents on the parcel of land where BMAK operates, 388 W. Carleton Road.

3.      What began as emergency campground in April of 2023 evolved first to a military-style, four-season, tent that was insulated and electrified with capacity for twenty or so residents, and then in October 2025, into HOPE Harbor, a nonprofit organization dedicated to providing sober transitional housing and wraparound services to house 16 individuals at a time as they worked to rebuild their lives.

4.      HOPE Harbor is a Michigan nonprofit corporation formed on October 2, 2025, with a mission to provide sober transitional housing services to persons suffering from addiction or vulnerable to substance abuse. The organization operates as a Level 2 monitored recovery residence under the standards of the National Alliance for Recovery Residences (NARR), providing comprehensive support including peer accountability, case management, life skills development, employment assistance, and connections to healthcare and mental health services.[4]

5.      HOPE Harbor's mission is driven by a simple but profound belief—that every person deserves an opportunity for redemption, stability, and hope. The organization seeks to create a safe, drug-free environment where residents can practice recovery, develop healthy habits and life skills, and transition successfully back into the community with sustainable permanent housing.

6.      HOPE Harbor's Bylaws state:

> The specific objectives and purpose of this corporation will provide sober transitional housing services to those suffering with addiction or vulnerable to substance abuse. Seeking to put God's love into action, HOPE Harbor provides sober transitional housing and supportive resources to people suffering from addiction with the goal of creating stability and maintaining permanent housing.

---

[4] See, "standards," NARR, available at narronline.org/standards (last visited March 15, 2026).

7.      The need for HOPE Harbor's services in Hillsdale County is acute and undeniable: as of 2026, HOPE Harbor is the only sober transitional housing facility in Hillsdale County. No other organization in the county provides transitional or recovery housing for persons with substance use disorders.

8.      This lack of recovery housing options has left a critical gap in the continuum of care for individuals who have completed initial treatment but need ongoing support to maintain sobriety and achieve stable housing.

9.      From April 2023 through September 2025, operating as "Camp Hope," Plaintiffs Melissa DesJardin and the nonprofit BMAK Charity Thrifts provided emergency shelter and recovery support services to over 330 homeless individuals, including 154 men, 92 women, and 58 children. Over 60% of the clients who lived at Camp Hope between 2023 and 2025 successfully transitioned to sobriety, employment, and permanent housing. Since the launch of HOPE Harbor in October of 2025, 13 additional individuals have received stable housing and wrap-around services through Plaintiffs' services.

10.      Up until the fall of 2025, Camp Hope operated a large military-style tent to house its clients. However, in October of 2025, the City of Hillsdale destroyed this facility, compelling DesJardin and her colleagues to find a new solution for serving the residents of Camp Hope. On October 15, 2025, the night before the City demolished Camp Hope, HOPE Harbor repurposed an existing facility that the thrift shop had been using for sorting merchandise to serve as a home for up to 16 clients.

11.      This building adjacent to the thrift shop at 386 West Carleton Road in Hillsdale, Michigan is a 904-square-foot structure in a B-3 (General Business) zoning district. The newly established HOPE Harbor entity immediately sought a city use permit to operate it as a licensed

5

sober transitional housing facility serving up to 16 residents with on-site case management and supervision.

12. Back on June 17, 2024, the Hillsdale City Counsel received and discussed the Report of its Homelessness Task Force, which recommended that the City "Allow the creation of a full-time, transitional shelter, PROVIDED that it is not in a residential area, that it serves the citizens of our own community, that it works to address the underlying causes of homelessness, that it has a community service work or employment requirement, and that it maintains strict rules against misbehavior." (emphasis in original.)

13. Camp HOPE was designed to meet these specifications. The Homelessness Task Force report was aware of Plaintiffs' operation at Camp HOPE and confirmed that Camp HOPE requires drug testing and imposes a work requirement for the residents. What's more, central to the Task Force's recommendation, Camp HOPE's location is **not** in a residential area; rather, it is located in a B3 general business zone that allows for residential uses in the forms of motels, apartment buildings, and mixed-use buildings with commercial and residential occupancy. Nonetheless, since November 2024, Defendant City of Hillsdale, Michigan (the "City"), and its officials have engaged in a concerted, escalating campaign to prevent HOPE Harbor from operating recovery housing within the City limits. This campaign has been characterized by aggressive code enforcement, discriminatory zoning denials, public vilification, and coordination with residents opposed to housing for persons in recovery from substance use disorders. The City's actions have been taken in response to, and in furtherance of, significant bias and discriminatory animus against individuals with substance use disorders and other disabilities.

14. The City was not a passive municipal participant refereeing a neutral dispute over land use. Rather, the City and its officials took a leading and active role in elevating, endorsing,

6

and acting upon unfounded and discriminatory community opposition to Camp Hope. City officials publicly stated that the sober housing facility "should be located outside city limits, so they won't bother anyone" and that the City would "never allow a permit within the city limits" for such housing. At a May 22, 2025, public safety meeting that Plaintiffs were not invited to attend, City officials and community members discussed "changing code" to ensure Camp Hope would be in violation and advised one another to "use social media to say camp home is a problem" and "plant a seed" of opposition. The City endorsed and amplified false allegations—including claims of rat infestations later disproven by professional pest inspection—and made no effort to correct the record or educate the public about the protections afforded to recovery housing under the law.

15.    The barriers erected by the City to obstruct Camp Hope and HOPE Harbor's operations have included forcibly demolishing Plaintiffs' emergency tent shelter (purchased by BMAK) on October 16, 2025, displacing vulnerable residents without providing alternative housing options; denying HOPE Harbor's application for an accommodation from its zoning code to operate recovery housing at 386 West Carleton Road on November 19, 2025,; denying HOPE Harbor's petition for a use variance to allow first-floor residential use to accommodate residents with mobility disabilities on February 25, 2026; imposing burdensome and discriminatory pre-application requirements, including demands for engineered site plans and pre-purchased furniture, that were not required of other applicants; and assessing over $3,500 in fines and demolition costs against Plaintiffs while refusing multiple requests for reasonable extensions or accommodations to allow orderly transition of residents. All told, Plaintiffs has incurred over $20,000 in damages arising from the City's discriminatory Not-in-my-backyard (NIMBY) campaign against them.

16.     These discriminatory acts by the City, taken because of the disabilities of HOPE Harbor's residents and prospective residents, have had and are continuing to have the purpose and effect of preventing HOPE Harbor from providing community-based sober living housing in Hillsdale and denying persons with substance use disorders and other disabilities the opportunity to live in supportive, recovery-oriented housing.

17.     The City's denial of reasonable accommodations is evidenced by its refusal to grant a zoning variance to permit first-floor residential use at 386 West Carleton Road, a single-story building with no second floor, to accommodate residents with mobility and other disabilities. Despite HOPE Harbor's explicit request for this accommodation on disability grounds, the City's Zoning Board of Appeals applied only standard variance criteria and made no individualized assessment of whether the accommodation was necessary to afford persons with disabilities equal opportunity to use and enjoy housing. The City also refused to provide any permit pathway for HOPE Harbor's tent shelter, stating it had no such permit available, and imposed a discriminatory demolition timeline without regard to the displacement of vulnerable disabled residents or the availability of alternative housing. Indeed, the City destroyed Camp Hope on October 16, 2025, even though the City's seasonal homeless shelter, Share the Warmth, would not open for the winter until November 1, 2025. Thus, the City's actions demonstrated deliberate indifference to the plight of individuals with disabilities and the homeless population within its boundaries.

18.     The City's disparate treatment of HOPE Harbor is evidenced by multiple instances of differential and less favorable treatment compared to other residential and commercial uses. For instance, the City has permitted Share the Warmth, a warming center operating as a homeless shelter from November through March, to operate seasonal housing for up to 40 individuals out of church facilities without the permits, site plans, or variances demanded of HOPE Harbor.

8

19.     The City and its elected and appointed officials' actions have caused opposition to persons with disabilities to flourish unchecked. Community members and City officials have made discriminatory statements characterizing HOPE Harbor's residents as undesirable, dangerous, and unworthy of living within city limits. False and stigmatizing claims about crime, property values, and public health—claims unsupported by evidence and contradicted by extensive research on recovery housing—have been repeated and endorsed by City officials without correction. The City has weaponized its zoning and code enforcement powers to exclude a protected class from accessing housing, under the guise of neutral land use regulation.

20.     Defendant's discriminatory actions have harmed and are continuing to harm HOPE Harbor by preventing it from fulfilling its mission of providing community-based recovery housing in Hillsdale County. HOPE Harbor has incurred significant financial losses, including architect fees, furnishings, fines, and demolition costs; loss of grant funding and donations; and the collapse of thrift store revenues that previously supported operations. The organization has been unable to secure funding from the County opioid committee due to the City's refusal to permit its operations. HOPE Harbor has been forced to divert scarce resources to fighting discriminatory enforcement actions rather than serving residents. The organization has suffered reputational harm from the City's public vilification campaign. Most critically, HOPE Harbor has been prevented from serving the very population it was created to help, denying individuals with substance use disorders and other disabilities access to the supportive housing necessary for successful recovery.

21.     Defendants' actions have similarly caused, and are continuing to cause, severe harm to Plaintiff Melissa DesJardin. Ms. DesJardin has suffered financial losses, emotional distress, and reputational damage as a result of the City's campaign against Camp Hope and HOPE Harbor. In the April of 2025, Ms. DesJardin was hospitalized for a severe panic attack directly attributable to

the stress of the City's escalating enforcement actions and public attacks. City officials have publicly called for her removal as Executive Director as a condition of permitting HOPE Harbor to operate. Ms. DesJardin has faced harassment, threats, and false accusations amplified by City officials. She has been personally named in code enforcement actions and fines and has been forced to appear in court multiple times to defend HOPE Harbor and BMAK's right to serve persons in need.

22.    Throughout 2024 and 2025, as Camp Hope sought to transition from emergency tent shelter to a permanent brick-and-mortar recovery housing facility, the City and its officials coordinated with and amplified discriminatory community opposition to housing for persons with substance use disorders in Hillsdale. Rather than educating the public about the City's obligations under federal and state fair housing and disability rights laws, City officials adopted, endorsed, and acted upon biased stereotypes and unfounded fears about persons in recovery from addiction.

23.    Above all, the City's actions have wreaked havoc on Plaintiffs Breanna Greenwalt and Brent Gale, two of HOPE Harbor's residents and beneficiaries of the shelter and many essential services provided by HOPE Harbor, BMAK, and Ms. DesJardin. The stable housing and multiple services have been essential to Greenwalt and Gale as they have each maintained their sobriety for nearly a year and stabilized their physical and mental health issues. Greenwalt works for the BMAK thrift shop and has stabilized her diabetes through regular treatment at a clinic that is a short walk from HOPE Harbor. Gale provides essential assistance with any and all physical tasks and chores needed to keep HOPE Harbor running as he works on stabilizing his mental health. Both Greenwalt and Gale know that if HOPE Harbor is not granted the accommodations needed to operate its recovery home, they will be forced back to the streets, where they will not have the support and stable shelter they need to remain sober, healthy, and productive.

24. The impact of the City's discrimination extends beyond individual residents to the broader Hillsdale community. Before Camp Hope's tent shelter was demolished in October 2025, law enforcement has found no homeless encampments in Hillsdale, because Camp Hope had provided a viable alternative to street homelessness. One the City demolished Camp Hope without providing any replacement, many individuals were pushed into large encampments just outside the City's limits. By passing the no-camping ordinance, Hillsdale has effectively chosen to criminalize homelessness and disability rather than allow a nonprofit organization to provide safe, supervised recovery housing.

25. Plaintiffs bring this civil rights action under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and Michigan's Persons with Disabilities Civil Rights Act, Mich. Comp. Laws §§ 37.1301-1303, 37.1602, seeking a declaratory judgment, preliminary and permanent injunctive relief, and compensatory damages resulting from Defendant's discriminatory actions, as well as their reasonable attorneys' fees and costs.

## PARTIES

26. Plaintiff HOPE Harbor is a 501(c)(3) nonprofit organization incorporated in the State of Michigan on October 2, 2025, with its principal place of business at 386 West Carleton Road, Hillsdale, Michigan 49242.

27. Plaintiff BMAK Charity Thrifts (hereinafter "BMAK") is a nonprofit corporation incorporated in Michigan on November 9, 2018 with its principal place of business at 390 W. Carelton Road in Hillsdale, Michigan.

28. Plaintiff Melissa DesJardin is the Executive Director and Resident Agent of HOPE Harbor and BMAK, and she resides in Hillsdale, Michigan.

11

29.    Defendant City of Hillsdale is a Michigan municipality located at 97 North Broad Street, Hillsdale, Michigan 49242. The City of Hillsdale is a public entity within the meaning of Title II of the Americans with Disabilities Act.

## JURISDICTION AND VENUE

30.    This Court has subject matter jurisdiction of the federal claims asserted in this action under 28 U.S.C. § 1331 because the action arises under the laws of the United States, including the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* and the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*

31.    Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' claims under Michigan law because those claims arise from a common nucleus of related facts and are so related to the federal claims within the original jurisdiction of this Court that they form part of the same case or controversy.

32.    Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201, 2202 and 1343, and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

33.    Under 28 U.S.C. § 1391(b), venue is proper in the Western District of Michigan because all events and omissions giving rise to Plaintiffs' claims occurred in this District and all parties reside in this District.

## FACT ALLEGATIONS

### Background on BMAK, HOPE Harbor and the Need for Recovery Housing

34.    In April 2023, the City of Hillsdale introduced Ordinance No. 2023-03, prohibiting camping on public property, and enacted the law on June 5, 2023.

35.    This ordinance was Hillsdale answer to a population of approximately 80 homeless residents: criminalize their plight rather than develop a strategy of supportive solutions.

12

36.     As Executive Director of BMAK Ms. DesJardin saw homeless individuals being displaced by this ordinance from the trails and public spaces where they had been sleeping, so she welcomed those effected by the ordinance to pitch their tents on the BMAK property.

37.     Within the first week after outreach to these individuals, 17 tents were set up behind the thrift store on the organization's property.

38.     What began as an emergency response to immediate need evolved into a mission-driven effort to provide safe, structured recovery housing.

39.     Ms. DesJardin and volunteers worked to create "Camp Hope"—a temporary shelter providing not just a safe place to sleep, but comprehensive support services including drug testing, sobriety requirements, case management, employment assistance, and connections to healthcare and treatment providers.

40.     From the very first day, residents were required to submit to testing for illegal drugs, non-prescribed medications and alcohol to remain at Camp Hope.

41.     In October 2023, Camp Hope installed a large, military-style tent structure to replace the individual tents and provide a more stable shelter environment equipped with sleeping areas, living space, heating, and electricity for year-round accommodation.

42.     Before installing this tent, DesJardin and her colleagues approached the City of Hillsdale to seek the correct permit for this facility.

43.     They were told by the City's zoning and assessing officials that there was no permit that they could file for the tent, so they could proceed to install the tent with its insulation, heating, and electrical facilities. Ms. DesJardin kept the City Manager apprised on all the activities related to Camp Hope.

44.    Over the following two years, Camp Hope served as Hillsdale County's only shelter providing housing for homeless individuals and families while requiring sobriety and offering recovery support services.

45.    HOPE Harbor operates as a Level 2 monitored recovery residence following the standards of the National Alliance for Recovery Residences (NARR).

46.    Level 2 residences are characterized by peer-based recovery support in a shared living environment, with unpaid staff who monitor resident participation in individual and community recovery activities.

47.    Residents develop and practice skills for living a clean and sober lifestyle while supporting each other, working, and attending recovery support meetings.

48.    The individuals served by HOPE Harbor are persons with disabilities within the meaning of the Fair Housing Act and the Americans with Disabilities Act.

49.    HOPE Harbor's stated purpose, as set forth in its Articles of Incorporation, is to "provide transitional housing services to the homeless in Hillsdale County" and  "Seeking to put God's love into action, HOPE Harbor provides sober transitional housing and supportive resources to people suffering from addiction with the goal of creating stability and maintaining permanent housing."

50.    The need for HOPE Harbor's services in Hillsdale is acute and unmet. As of 2026, HOPE Harbor is the only sober transitional housing facility in the area.

51.    There is no other transitional housing or sober transitional housing program serving persons with substance use disorders anywhere in Hillsdale county besides HOPE Harbor. There are two rehabilitation facilities in the area, but they do not provide transitional housing services for this population.

52.     While the City allowed Camp Hope to operate without any interference in 2024, starting in late 2024 and through 2025, the City initiated a protracted and insistent effort to disband Camp Hope.

53.     By October 2, 2025, with the City's destruction of the tent structure imminent but no lack of ongoing need for recovery housing in Hillsdale, Ms. DesJardin and other community members formally incorporated HOPE Harbor as a Michigan nonprofit corporation.

### BMAK, HOPE Harbor, and Camp Hope

54.     BMAK, HOPE Harbor and Camp Hope's operations center on two adjacent properties located at 390, 386, and 388 West Carleton Road in Hillsdale, Michigan.

55.     BMAK holds a land contract for purchase of these properties, with HOPE Harbor leasing its building at 386 W. Carleton Road from BMAK.

56.     Both properties are in a B-3 (General Business) zoning district and are situated at the southwest corner of West Carleton Road (M-99) and Mechanic Street.

57.     The larger property at 390 West Carleton Road contains the former Elias Brothers Big Boy restaurant building, which since 2018 has housed Hillsdale Community Thrift, operated by BMAK.

58.     BMAK uses all its proceeds for charitable purposes, including "relief of the poor, the distressed and the underprivileged, along with donations to charities within the county where the facility is located."

59.     The smaller property at 386 West Carleton Road contains a single-story commercial building of approximately 904 square feet.

60.     BMAK had used this facility to sort merchandise for its thrift shop.

61.     On November 1, 2025, BMAK entered into a lease with HOPE Harbor for the 386 West Carleton Road building, with the stated use of "Sober Transitional Housing."

15

62.    HOPE Harbor's plan for the 386 West Carleton Road building is to operate it as a sober transitional housing facility serving up to 16 residents, with sleeping areas equipped with bunk beds, a kitchen and living area, bathroom facilities, and on-site case management and supervision.

63.    HOPE Harbor later indicated it would reduce capacity to accommodate City concerns and comply with occupancy standards.

64.    The single-story layout of the building, with no second floor, makes it accessible for residents with mobility disabilities.

65.    Between April 2023 and October 2025, the property at 388 West Carleton Road was the location of Camp Hope's tent shelter operations. Beginning with individual tents in April 2023, Camp Hope evolved into the large tent structure installed in October 2023.

66.    The Camp Hope tent structure was insulated, equipped with electricity and heating, and divided into sleeping areas and living areas. It was equipped with two exits marked with fire exit signs.

67.    Kitchen and bathroom facilities were a few steps from the tent, and the facilities were monitored by on-site staff and volunteers.

68.    Throughout its operations, Camp Hope maintained the sobriety and safety protocols described above to ensure that residents were supervised and adhering to sobriety requirements for residence.

69.    Camp Hope operated as a family unit with shared accountability for chores, cooking, household maintenance, and behavioral expectations.

70.    Residents met with Ms. DesJardin multiple times per week for case management, assistance navigating social services, employment support, and connections to healthcare providers.

71.    Weekly meetings, Bible study, conflict resolution sessions, and peer support groups were integral to the program.

72.    Camp Hope provided comprehensive wraparound services designed to address the root causes of homelessness and addiction.

73.    Services included employment assistance and job training; case management and coordination with treatment providers; assistance obtaining identification documents, birth certificates, and Social Security cards; connections to medical, dental, and mental health care; life skills development including budgeting, cooking, and household management; transportation assistance; and family reunification support where appropriate.

74.    Residents were expected to work toward self-sufficiency: those who were employed were expected to save their earnings for the goal of independent living, while those who were unemployed were required to actively seek employment, attend job training, apply for disability, and/or engage in community volunteer work.

75.    The thrift store employed some Camp Hope residents, such as Breanna Greenwalt, while others like Brent Gale performed chores and upkeep at the property.

76.    The length of stay at Camp Hope varied depending on individual needs and progress.

77.    National data on recovery housing shows average stays of approximately one year.

78.    Camp Hope welcomed residents for as long as necessary to achieve stable sobriety, secure employment, and transition to permanent independent housing.

**Success of Camp Hope and HOPE Harbor's Services**

79.    From April 2023 through September 2025, Camp Hope served more than 330 individuals with disabilities who were also homeless, including 154 men, 92 women, and 58 children. Twenty-three families stayed at the property during this period.

80.    The demographic profile of Camp Hope residents reflected the diversity of persons experiencing homelessness in Hillsdale County, with residents ranging in age from infants to individuals in their sixties and seventies.

81.    66 of the adult men and women residents were receiving disability benefits, reflecting the high prevalence of disabilities among persons experiencing homelessness.

82.    These disabilities included not only substance use disorders but also mental health conditions, chronic medical conditions, and physical disabilities affecting mobility.

83.    118 individuals had been homeless for less than a year before arriving at Camp Hope. 128 had been homeless for more than one year, reflecting the chronic nature of homelessness for many individuals who lack access to supportive services and affordable housing.

84.    Camp Hope achieved a success rate of over 60% in helping residents transition to stable sobriety and permanent housing.

85.    As of September 2025, 173 individuals served by Camp Hope remained stably housed.

86.    Specific pathways to stability included: 163 residents transitioned directly from Camp Hope to permanent housing; 12 residents went from Camp Hope to rehabilitation facilities and then to permanent housing; 28 residents were removed for drug use, were incarcerated, completed rehabilitation, and then achieved permanent housing; 22 residents cycled from Camp Hope to jail and back to Camp Hope before achieving permanent housing.

18

87.    On November 14, 2025, disAbility Connections, the Center for Independent Living serving Hillsdale, Jackson, and Lenawee Counties, issued a letter of support stating: "disAbility Connections is very pleased to provide this letter of support for Hope Harbor within the city of Hillsdale, MI with a focus on providing accessible housing for the unhoused . . . Facilities like Hope Harbor strengthens the community by improving public health, reducing encampments, and connecting people with employment, mental health services, and other much needed supports."

88.    The critical need for HOPE Harbor's services, the absence of comparable resources in Hillsdale County, the success of Camp Hope in achieving positive outcomes for residents, and the broad support from disability rights organizations and homeless services providers all demonstrate that HOPE Harbor provides necessary housing and services for persons with disabilities who would otherwise lack equal opportunity to access safe, supportive housing in the Hillsdale community.

**Early Awareness and Initial Tolerance (2023-2024)**

89.    On June 5, 2023, the Hillsdale City Council adopted Ordinance No. 2023-03, titled "An Ordinance to Prohibit Camping on Public Property."

90.    Within the first week after the City had released information in April about the pending ordinance, 17 tents were erected on BMAK's property.

91.    On July 18, 2023, the Branch-Hillsdale-St. Joseph Community Health Agency conducted an inspection of the Camp Hope property and met with Mrs. DesJardin.

92.    Following that inspection, the health agency issued a letter to Hillsdale Community Thrift Store citing a violation of Michigan Compiled Law Section 333.12501(1)(a) for operating a temporary camping facility with five or more sites without a campground license.

93.    The letter ordered discontinuance of the campground within 60 days, by September 16, 2023.

94.    In response to these concerns, Camp Hope pivoted to compliance by installing a large, military-style tent structure to replace the individual tents and provide more stable shelter with heating, electricity, and defined living spaces.

95.    This tent structure would remain in place for approximately two years, serving as Hillsdale's only 24-hour, year-round emergency homeless shelter.

96.    Throughout 2024, the City was aware that Camp Hope continued to operate and operate as a sober living facility.

97.    Camp Hope operated with the City's de facto tolerance through 2024, during which time it served hundreds of residents.

98.    Indeed, on June 17, 2024, the Hillsdale City Counsel received and discussed the Report of its Homelessness Task Force, which recommended that the City "Allow the creation of a full-time, transitional shelter, PROVIDED that it is not in a residential area, that it serves the citizens of our own community, that it works to address the underlying causes of homelessness, that it has a community service work or employment requirement, and that it maintains strict rules against misbehavior." (emphasis in original.)

99.    Camp Hope was by all measures serving this function for the city, yet none of the City's elected or appointed officials noted the connection between the Task Force recommendations and Plaintiffs' work.

100.   Despite this awareness and the City's acknowledgment that Camp Hope served a critical need while the City explored long-term solutions, the City took no action to assist BMAK, DesJardin, and Camp Hope in obtaining proper permits or transitioning to a permanent facility during 2023 and 2024.

**The City's Enforcement Campaign Begins (Late 2024)**

101.    Despite Camp Hope's clear service to the City and the City's own lack of action to address the needs of homeless individuals with disabilities, City officials began coordinating to shut down Camp Hope in January of 2025.

102.    DesJardin and others had to argue to the City Council that such a plan would leave high risk members of the community at risk of deadly cold conditions if Camp Hope were demolished in January.

103.    Such a timeframe was also impractical because the tent would be frozen to the ground at that time of year.

104.    When DesJardin and BMAK first set out in the fall of 2023 to install the military-grade tent, they asked the City's permit and assessor officials and were told there was no permit needed or available for such an undertaking.

105.    Nonetheless, on October 30, 2024, the City issued a formal zoning violation notice (Enforcement No. E2024-0350) to BMAK Charity Thrifts for the property at 388-390 West Carleton Road. The notice cited "CONSTRUCTION WITHOUT PERMIT" and stated: "TEMPORARY BUILDING ERECTED WITHOUT PERMIT - B-3 ZONING DISTRICT, REQUIRES SITE PLAN APPROVAL BY PLANNING COMMISSION."

106.    The very next day, on October 31, 2024, City Manager David Mackie sent an email to the Mayor and entire City Council stating: "This email is to let you know the City Assessor and I met with Missy DesJardin yesterday about Camp Hope. Missy was told that Camp Hope doesn't meet the City's codes, which she acknowledged, and needs to be disbanded. We're giving her 90 days to accomplish this task."

107.    In the October 31, 2024, email, City Manager Mackie further stated: "I believe everyone thought this was a short-term fix until a long-term solution could be identified and

21

enacted. Unfortunately, that long-term solution hasn't been identified. The above being said, we can no longer overlook the situation and must enforce our codes."

108.    On November 18, 2024, the City Council discussed Camp Hope with Melissa DesJardin. According to official City records, the Council discussed "the fact the structure didn't meet zoning and building codes."

109.    After this discussion, the Council suggested to City staff that Camp Hope be given until spring 2025 to remove the tents and relocate its tenants.

110.    On December 2, 2024, City Council members made clear during public discussion that they would not support forcible eviction and removal of the tent during the winter months.

111.    On January 7, 2025, Ms. DesJardin submitted a request for an extension of the deadline, which the City approved.

112.    On January 8, 2025, the City's Code Enforcement office issued a letter extending the compliance deadline to April 30, 2025, and assigning a new enforcement number (E2025-0002).

113.    A City inspector's comment noted: "TENT STRUCTURE BUILT WITHOUT PERMITS."

### Forced Closure and Demolition of Camp Hope (2025)

114.    On or about March 14, 2025, BMAK Charity Thrifts submitted a Code Enforcement Extension Request form seeking additional time beyond the April 30, 2025 deadline.

115.    The request stated: "We still have 11 people in the tent. We are still working on housing for them. Our goal is to have them all in housing before winter."

116.    On March 27, 2025, the City's Code Enforcement office denied Ms. DesJardin's extension request.

117.    As of May 1, 2025, the tent structure was still in place. On that date, the City issued a Municipal Civil Infraction Notice of Violation (Number H2606) to BMAK Charity Thrifts.

118.    The notice warned that "Failure to make corrections or to contact this office by the deadline may result in issuance of another Municipal Civil Infraction Notice of Violation, a Municipal Civil Infraction Citation, or other action as deemed necessary to protect the health and safety of the public."

119.    On May 22, 2025, the City held a Public Safety Committee meeting at which Camp Hope was discussed extensively.

120.    This meeting's agenda was published with minimum requisite time allowed to avoid alerting Ms. DesJardin and her Camp Hope colleagues that it was being held.

121.    On information and belief, community members opposed to Camp Hope were notified of the meeting and encouraged to attend to express their opposition to Camp Hope.

122.    At this May 22, 2025, meeting, City officials and community members discussed multiple allegations against Camp Hope.

123.    According to contemporaneous notes and video recordings of the meeting, participants discussed "changing code so [Camp Hope/Hillsdale Community Thrift] would be in violation" and advised one another to "use social media to say camp home is a problem" and to "plant a seed" of community opposition.

124.    At approximately the 18:27 mark of the May 22, 2025 meeting video, Councilman Bob Flynn stated: "***churches aren't doing enough and we are not big enough to have a homeless shelter. Yeah we can raise your taxes, but no one wants that hahahahahahaha***." Councilman Flynn's mocking laughter at the prospect of providing housing for homeless individuals with

23

disabilities demonstrates the contemptuous attitude of City officials toward the population HOPE Harbor serves.

125. At approximately the 38:00 mark of the May 22, 2025, meeting, City officials urged code enforcement to harass Camp Hope, and with it BMAK and DesJardin, by "laying down the law."

126. The meeting is rife with unfair and disparaging stereotypes of Camp Hope residents stated by elected and appointed officials, as well as by the select attendees who were brought together to express their opposition to Camp Hope.

127. City Councilman Gary Wolfram stated at a City meeting that homeless services and recovery housing "should be outside city limits, away from everyone else"—expressing sentiment that persons with disabilities should be segregated from the community rather than integrated into residential neighborhoods.

128. City Councilman Robert Socha stated that Hillsdale is "maxed out" regarding services for homeless individuals and persons in recovery, despite the fact that Camp Hope was the only recovery housing facility in the city and served a population with no other housing options.

129. City Councilman Bob Flynn made a derogatory reference to the "people of the corn" when discussing Camp Hope residents, using demeaning language to characterize persons with disabilities experiencing homelessness.

130. Apple Run resident and former City Council member Cindy Pratt circulated false allegations that Camp Hope was the source of a rat infestation at the neighboring Apple Run apartment complex.

131. These allegations were publicized in a letter sent by Apple Run management to all apartment residents, stating that rats at the apartment complex were caused by Camp Hope.

24

132.    In response to these false allegations, Camp Hope hired Orkin, a professional pest control company, to conduct a thorough inspection of the Camp Hope property. Orkin's inspection found no evidence of any rodent infestation at the Camp Hope property.

133.    DesJardin provided the Orkin inspection report to City officials and to the apartment complex management company, but no retractions or corrections were ever made to the record.

134.    Video recordings of the May 22, 2025, Public Safety Committee meeting document extensive discriminatory statements by City officials and community members. At approximately the 13:00 mark of the meeting video, participants discussed "changing code so [Camp Hope/Hillsdale Community Thrift] would be in violation"—a deliberate effort to use zoning enforcement to target housing for persons with disabilities.

135.    Indeed, Apple Run Apartment's management sent a letter expressing these false accusations about Camp Hope to the City, and this letter was included in a City Council packet for the public record.

136.    Another member of the public at this May 22, 2025, meeting announced himself as a expert on building safety because he is a volunteer fire fighter.

137.    This individual stated that Camp Hope had "one exit and no bathroom/plumbing provided" even though he had never entered the premises.

138.    Had he done so, he would have known that these statements were demonstrably false: the tent structure had two separate exits clearly marked with illuminated fire exit signs, and bathroom facilities with running water and sanitation were provided on the property.

139.    At no point during the May 22, 2025, meeting or any other public meeting did any City official explain to the public that persons in recovery from substance use disorders are

25

protected by federal and state disability rights laws, that municipalities have legal obligations to make reasonable accommodations for housing for persons with disabilities, or that much of the opposition being voiced was based on discriminatory stereotypes prohibited by law.

140. At no point did any City official publicly defend HOPE Harbor's legal right to operate recovery housing or acknowledge the organization's documented success in helping individuals achieve sobriety and stable housing.

141. Throughout the spring and summer of 2025, City officials made no effort to assist Plaintiffs in identifying a pathway to legal operation of emergency or transitional housing for homeless individuals.

142. At no time did the City provide alternative housing options or resources for the individuals who would be displaced by closure of Camp Hope.

143. On June 26, 2025, the City issued a Municipal Civil Infraction Citation (Ticket Number H2622, Enforcement Number E2025-0002) to BMAK Charity Thrifts. The citation was filed in Hillsdale County 2-B District Court.

144. On September 2, 2025, BMAK Charity Thrifts, by and through its director and authorized representative Melissa DesJardin, entered into a Consent Judgment with the City of Hillsdale in District Court. Under the Consent Judgment, BMAK admitted responsibility for violation of Section 36-34 of the Hillsdale Municipal Code regarding the tent structure.

145. The Consent Judgment provided that BMAK must obtain required zoning permits or remove the noncompliant tent structure within 14 days.

146. The Consent Judgment authorized the City, in the event of non-compliance after 14 days, to assess fines and costs including attorney's fees, and authorized City staff or contractors to

26

enter the property to remove noncompliant structures, with expenses to be assessed as a lien against the property.

147.    At the time the consent judgment was entered, the City's attorney advised Ms. DesJardin that she should contact him if an extension was needed.

148.    On September 11, 2025, Ms. DesJardin informed the attorney that Plaintiffs would need an extension and he advised her to contact Assessor Kim Thomas.

149.    Shortly thereafter, Ms. DesJardin met with Ms. Thomas in person to request the extension and Ms. Thomas said that she would get back to Ms. DesJardin.

150.    Ms. Thomas never advised Ms. DesJardin of any paperwork or other formality that would be necessary to request this extension.

151.    Ms. Thomas did admit at a City Council meeting that she and Ms. DesJardin discussed the need for the extension.

152.    At this time, Ms. DesJardin also advised Ms. Thomas that she was working on a plan to renovate the building at 386 West Carleton Road for transitional housing, that she had hired an engineer to prepare plans, and that she would submit a formal request for an extension of the deadline set in the Consent Judgment.

153.    As of mid-September 2025, the tent structure remained in place and continued to operate as a recovery residence for persons with addiction and other disabilities.

154.    On September 25, 2025, the Hillsdale County District Court entered default judgments in cases 25H2622 and 25H2622B, assessing fines and costs of $170.00 on each of the citations each and ordering BMAK Charity Thrifts to pay these costs directly to the City of Hillsdale.

155.    On October 6, 2025, the matter of Camp Hope came before the Hillsdale City Council for discussion and action.

156.    During this City Council meeting, members of the public expressed false statements about Camp Hope and its residents and their unfair stereotypes about persons with disabilities were not corrected at the time by any of the elected and appointed Hillsdale officials present.

157.    Nonetheless, the City Council voted 5-3 to post the tent as unsafe for human habitation, to begin eviction proceedings, and to authorize removal of the noncompliant tent structure.

158.    Following the October 6, 2025, City Council vote, on October 8, 2025, City officials posted a notice on the Camp Hope tent structure declaring it "UNFIT FOR HUMAN HABITATION" and ordering all occupants to vacate the premises by 11:59 p.m. on October 15, 2025. The notice cited multiple violations of the International Property Maintenance Code.

159.    On October 12, 2025, HOPE Harbor sent an email to the Hillsdale City Council requesting a 90-day delay in demolition of the tent.

160.    The email stated: "A 90-day delay in tearing down the tent would give the city time to approve the real building at Hope Harbor. An occupancy permit application is being sent into the building department this week... the $400 fee ready to turn in Monday."

161.    The City never responded to HOPE Harbor's October 12, 2025, request for a 90-day delay.

162.    On October 16, 2025, at 8:00 a.m., City crews demolished and removed the Camp Hope tent structure. City Manager Mackie confirmed in later communications that "At 8 AM on October 16th . . . [the City] removed the tent."

163.    All residents who had been living in the tent were displaced.

28

164.   Residents, BMAK, and others from Camp Hope removed the majority of the beds and residents' personal property to the small building at 386 W. Carleton that had been designated to serve as HOPE Harbor.

165.   The City provided no alternative housing and no transitional assistance to help displaced residents find shelter elsewhere.

166.   On October 24, 2025, the City issued an invoice to BMAK for demolition costs in the amount of $2,834.00, with a payment deadline of November 22, 2025. The invoice warned: "Failure to pay invoice by the deadline will result in the invoice amount being added to the property as a tax lein [sic]."

167.   On October 27, 2025, the City issued an additional invoice for supplemental demolition costs of $689.00, bringing the total demolition costs assessed against BMAK Charity Thrifts to $3,523.00.

168.   On November 26, 2025, HOPE Harbor sent an email requesting that the City Council forgive the fines and demolition costs stemming from Camp Hope. The City Clerk responded that the council meeting packet had already been finalized.

169.   On December 1, 2025, the City Council voted 6-3 to deny requests to forgive the demolition costs and associated fines totaling $3,523.00 assessed against BMAK Charity Thrifts.

### The City Refuses to Permit the Permanent Building

170.   While the City was pursuing demolition of the Camp Hope tent structure, HOPE Harbor was simultaneously working to secure approval to operate the permanent brick-and-mortar building at 386 West Carleton Road as a sober transitional housing facility.

171.   On October 12, 2025, Plaintiffs requested a 90-day delay for the removal of Camp Hope, but the City never acknowledged this request.

29

172.    In fact, at the December 1, 2025, City Council meeting, the City Manager admitted that he personally rejected this request because "the council wanted [the tent] down.."

173.    On October 14, 2025, just two days before the City demolished the Camp Hope tent structure, HOPE Harbor submitted a Commercial Site Plan Review Application to the City's Planning and Zoning Department for the property at 386 West Carleton Road.

174.    The application sought approval for a change in use from storage to boarding house and was assigned permit number PZ2025-076. HOPE Harbor paid the required $400 application fee.

175.    The application, assigned permit number  PZ2025-076, identified the proposed use as a change from storage to boarding house and was accompanied by site plans and other required documentation.

176.    HOPE Harbor's application included comprehensive documentation prepared by licensed architect Tim Nichols (License No. 1301060188), who provided detailed architectural plans and floor plans for the proposed sober transitional housing facility.

177.    The architectural plans showed a single-story building of approximately 904 square feet with no second floor. The floor plans depicted the layout of sleeping areas equipped with bunk beds (four triple bunk beds and two double bunk beds), a kitchen and living area, bathroom facilities, storage space, and designated areas for case management and supervision.

178.    The floor plans clearly identified two separate exits from the building for emergency egress, with proper signage and compliance with fire safety requirements. The plans showed windows in sleeping areas meeting emergency egress standards under Section 305.6 of the International Property Maintenance Code.

179.    HOPE Harbor provided detailed operational documentation describing the facility's management structure, including 24/7 on-site staff monitoring, partnerships with established recovery housing providers and treatment facilities, and coordination with healthcare and mental health service providers in Hillsdale County.

180.    HOPE Harbor submitted comprehensive operational rules and protocols governing resident behavior and facility operations, including mandatory sobriety requirements, random drug testing protocols, behavioral expectations, shared responsibility for household chores and maintenance, requirements for employment or job-seeking activities, and case management services.

181.    HOPE Harbor described its operating model as a Level 2 monitored recovery residence following standards of the National Alliance for Recovery Residences (NARR), emphasizing peer accountability, communal living, recovery support meetings, life skills development, and pathways to permanent independent housing.

182.    On October 29, 2025, the City conducted a preliminary Department Head Site Plan Review of HOPE Harbor's application.

183.    On November 3, 2025, Zoning Administrator Olivia Smith provided HOPE Harbor with notes from the Department Head review, raising questions about the proposed use, capacity, site features, and compliance with various code requirements.

184.    The notes raised numerous questions and imposed burdensome requirements regarding the proposed use, including demands for clarification of the specific occupancy classification under the Michigan Building Code, requirements for architect or engineer-sealed prints if the facility would house more than 16 people, questions about sprinkler system requirements, demands for documentation of hard-wired fire and smoke alarm systems, and

extensive inquiries about operational details such as overnight supervision and case management staffing.

185.    The Department Head review imposed requirements on HOPE Harbor that were not imposed on other applicants seeking approval of commercial or residential uses: the City demanded that HOPE Harbor provide detailed operational information typically not required for other housing applications, including specific protocols for drug testing, sobriety enforcement, resident supervision, and case management services.

186.    On November 8, 2025, HOPE Harbor submitted amended information to address the City's questions and concerns. This submission clarified that HOPE Harbor proposed to house no more than 16 temporary residents at a time.

187.    As demanded by Assessor Kim Thomas, HOPE Harbor was also required to limit residents' lengths of stay to six months, even though such an arbitrary provision was not in keeping with Plaintiffs' intent or the needs of HOPE Harbor's clients.

188.    At all times HOPE Harbor was designed to function as transitional housing rather than permanent residence, but without any arbitrary maximum stay, as each individual with a disability needed to maintain stable housing at HOPE Harbor that was necessary and appropriate for that individual's disability and recovery plan.

189.    HOPE Harbor's November 8, 2025, submission emphasized that the proposed occupancy would comply with applicable building and fire codes, that the sleeping area would have two door exits for emergency egress, that windows would meet emergency egress requirements, and that the facility would maintain 24/7 on-site staff monitoring to ensure resident safety and compliance with program requirements.

190. On November 18, 2025, HOPE Harbor submitted additional detailed documentation regarding the rules and policies governing resident behavior, including strict prohibitions on excessive public displays of affection anywhere on the property, requirements that all residents maintain forward progress toward foundational wellness, mental health wellness, physical wellness, and financial wellness, and the use of 24/7 video surveillance inside and outside the facility (except in bathroom areas) to ensure safety and compliance.

191. HOPE Harbor provided documentation demonstrating its established track record of success in serving homeless individuals and persons in recovery from substance use disorders, including statistical data showing that from April 2023 through September 2025, Camp Hope had served over 330 individuals, with over 60% successfully transitioning to sobriety and permanent housing.

192. Thus, the Hillsdale City Planning Commission was fully aware that HOPE Harbor's application was made on behalf of persons with disabilities and involved a request for a reasonable accommodation from the zoning designations for the site.

193. On November 19, 2025, the Hillsdale City Planning Commission held a public meeting at which it considered HOPE Harbor's Commercial Site Plan Review Application for 386 West Carleton Road.

194. During the Planning Commission's discussion of HOPE Harbor's application, architect Tim Nichols made himself available to answer questions from the Commissioners regarding the proposed use, building layout, safety features, and operational plans.

195. Keri Stewart, President of HOPE Harbor's Board of Directors, responded to the Commissioners' questions, clarifying that the kitchen was not a commercial kitchen, that housing

33

would be provided to residents without charge, and providing details about the services and support that would be provided to residents with disabilities.

196.    At the November 19, 2025, Planning Commission meeting, Commissioner Laycock reviewed the City's B-3 zoning ordinance and stated that the application "fails to meet the definition of an allowable use. No dormitories are to be permitted."

197.    The Planning Commission's denial was based solely on this prohibition of ground-floor residential use in the B-3 zoning district.

198.    The Commission made no individualized assessment of whether the proposed use was substantially similar to other permitted uses in the B-3 district, made no assessment of whether a reasonable accommodation was necessary to afford persons with disabilities equal opportunity to use and enjoy housing, and made no assessment of the specific characteristics or impacts of HOPE Harbor's proposed use.

199.    The Planning Commission voted unanimously to deny HOPE Harbor's Commercial Site Plan Review Application. All Commissioners present voted in favor of the denial. No Commissioner expressed any concern about the City's obligations under the Fair Housing Act or Americans with Disabilities Act to provide reasonable accommodations for housing for persons with disabilities.

200.    HOPE Harbor's explicit request for accommodation based on disability—that the building had no second floor and therefore requiring second-floor residential use effectively prohibited any housing for persons with mobility disabilities or other disabilities requiring accessible first-floor housing—received no consideration or response from the Planning Commission.

201.    All Planning Commissioners present voted in favor of denial and the application was unanimously denied.

202.    The basis for the Planning Commission's denial was Section 36-293(12)(c) of the Hillsdale Municipal Code, which provides that in the B-3 General Business zoning district: "Dwelling units and accessory buildings related to residential uses shall not be permitted on the ground floor."

203.    At the same November 19, 2025, Planning Commission meeting, when addressing a separate matter involving an ambiguity in the City's sign ordinance regarding murals, the Commission instructed City staff to interpret the ambiguity "in favor of the applicant." This favorable interpretation was moved by Commissioner Winters and seconded by Commissioner Shelley, with all Commissioners voting in favor. The Commission's willingness to interpret ambiguous ordinance language in favor of other applicants, but unwillingness to grant any accommodation or exception for HOPE Harbor's housing for persons with disabilities, demonstrated disparate treatment.

204.    On November 21, 2025, Zoning Administrator Olivia Smith issued a formal letter to HOPE Harbor denying Zoning Permit PZ2025-076. The letter stated: "The zoning permit PZ2025-076 for the proposed project at 386 W CARLETON RD has been denied by the Hillsdale City Planning Commission at their November 19, 2025, meeting."

205.    The November 21, 2025, denial letter advised HOPE Harbor of its right to appeal the Planning Commission's decision to the Zoning Board of Appeals and provided information regarding the appeal procedure under Section 36-84 of the Hillsdale Municipal Code.

206.    On November 24, 2025, the City issued yet another Municipal Civil Infraction Notice of Violation (Number H2640, Enforcement Number E2025-0260) to BMAK Charity

35

Thrifts for the property at 386 West Carleton Road, citing use of the building without proper permits.

207. With no other place for its residents to go, HOPE Harbor, DesJardin, and BMAK determined that it was safest for their residents to stay in the 386 West Carleton Road building as they sought the reasonable accommodation needed from the zoning code to allow them to operate the building as a recovery residence.

208. On January 13, 2026, HOPE Harbor filed a petition with the Hillsdale City Zoning Board of Appeals requesting a reasonable accommodation in the form of a use variance to permit first-floor residential use at 386 West Carleton Road for a recovery home serving persons with disabilities.

209. The petition was assigned variance number VV26-0001. HOPE Harbor paid the required $300 petition fee.

210. In its petition to the Zoning Board of Appeals, HOPE Harbor explicitly requested a reasonable accommodation on disability grounds, stating: "The building with address 386 w Carleton will be used for Transitional Housing. We are asking for the residential use on the 1st floor rather than the second floor under the multiuse. We are asking for this reasonable accommodation to allow those with disabilities access."

211. HOPE Harbor's appeal including information about the sober-living and recovery program for the facility, along with explanations of the program and design for persons with disabilities.

212. Thus, at all times the City's Zoning Board of Appeals was aware that this application from HOPE Harbor was for a reasonable accommodation from the zoning codes for persons with disabilities.

213.    Even though all of the information included in the application packet reviewed by the Planning Commission is supposed to be provided to the Zoning Board of Appeals for its deliberations, significant information provided by Plaintiffs to the Planning Commission was left out of the ZBA packet.

214.    Also, the Fair Housing Center of Southeast and Mid-Michigan provided a letter to the City about Plaintiffs' rights under the Fair Housing Act, and while the City Council acknowledged receipt of this letter, it too was omitted from the ZBA packet.

215.    On January 21, 2026, the City mailed notices to surrounding property owners advising them of HOPE Harbor's variance petition and the scheduled public hearing. Public notice was published in the Hillsdale Daily News and on hillsdale.net on January 23, 2026.

216.    On February 11, 2026, the Hillsdale City Zoning Board of Appeals held a public hearing on HOPE Harbor's petition for a use variance.

217.    At the February 11, 2026, meeting, residents of Apple Run apartments, a residential apartment building with 40 units adjacent to HOPE Harbor, spoke to disparage the residents of HOPE Harbor, BMAK, and DesJardin with falsehoods and unfair stereotypes about persons with disabilities.

218.    At no point during this meeting did anyone on the Zoning Board of Appeals address the implications of the Fair Housing Act, the Americans with Disabilities Act or the Michigan Persons with Disabilities Act on the HOPE Harbor application for a reasonable accommodation.

219.    At no point during the hearing did the Zoning Board of Appeals engage in any interactive process with HOPE Harbor to explore whether alternative accommodations might address both the disability-related need for accessible first-floor housing and any legitimate concerns the City might have about the proposed use.

37

220.    Rather, the Hillsdale Zoning Board of Appeals applied standard use variance criteria set forth in Michigan zoning law and the Hillsdale Municipal Code with no consideration of the legal obligations to address the needs of persons with disabilities.

221.    The ZBA made no individualized assessment of whether the requested accommodation was necessary to afford persons with disabilities equal opportunity to use and enjoy housing, nor did it engage in any interactive process with HOPE Harbor regarding alternative accommodations that might address disability-related needs while mitigating any legitimate concerns.

222.    On February 25, 2026, the Zoning Board of Appeals issued its written decision denying HOPE Harbor's petition for a use variance. The ZBA's decision letter, signed by Chair Daniel LaRue, stated five findings in support of the denial, all based on standard variance criteria with no analysis of federal or state fair housing or disability accommodation requirements.

223.    All five findings stated in the ZBA's February 25, 2026 decision letter applied traditional zoning variance standards focused on hardship, uniqueness of property conditions, and impacts on surrounding properties. None of the findings addressed whether the requested accommodation was necessary to afford persons with disabilities equal opportunity to access housing, whether denial of the accommodation would result in discrimination against persons with disabilities, or whether the accommodation would impose undue financial or administrative burdens on the City or fundamentally alter the nature of the City's zoning program.

224.    Following the denial of the use variance, HOPE Harbor was prohibited from operating sober transitional housing at 386 West Carleton Road and will have no other viable location to serve individuals with disabilities in need of recovery housing in Hillsdale once its time to appeal the ZBA decision expires on March 27, 2026.

225.    The Zoning Board of Appeals made no mention in its decision letter of the Fair Housing Act, the Americans with Disabilities Act, Michigan's Persons with Disabilities Civil Rights Act, or any obligation to provide reasonable accommodations for persons with disabilities in the application of zoning ordinances.

226.    The Zoning Board of Appeals made no findings regarding whether the City's categorical prohibition of any residential use in a single-story building in the B-3 district had a discriminatory impact on persons with disabilities, or whether such a categorical prohibition was justified by legitimate, nondiscriminatory reasons.

227.    The decision of the ZBA is considered a final decision under Michigan law, notwithstanding HOPE Harbor's right to challenge that ruling in the Circuit Court for Hillsdale County.[5]

**The City's Failure to Address its Obligations Under Federal and State Fair Housing and Disability Rights Laws**

228.    At all times relevant to this action, the City of Hillsdale has had no formal reasonable accommodation procedure in its zoning ordinance or administrative regulations. The City's zoning code contains no process, standards, or criteria for evaluating requests for reasonable accommodations to zoning rules based on disability.

229.    The City's zoning code contains no provision acknowledging the City's obligations under the Fair Housing Act, the Americans with Disabilities Act, or Michigan's Persons with Disabilities Civil Rights Act to make reasonable accommodations in zoning rules and procedures when such accommodations are necessary to afford persons with disabilities equal opportunity to use and enjoy housing.

---

[5] HOPE Harbor has elected to bring its civil rights challenges to Federal Court rather than appeal the ZBA's unreasoned decision to the County Circuit Court.

230.    When HOPE Harbor explicitly requested a reasonable accommodation based on disability in its January 13, 2026 petition to the Zoning Board of Appeals—stating clearly that the accommodation was needed "to allow those with disabilities access"—the City applied only standard zoning variance criteria rather than the reasonable accommodation standards required by federal and state civil rights laws.

231.    Under the Fair Housing Act, a municipality must make a reasonable accommodation in zoning rules when the accommodation is necessary to afford persons with disabilities equal opportunity to use and enjoy housing, unless the accommodation would impose undue financial or administrative burdens or require a fundamental alteration in the nature of the zoning program.

232.    The focus is on the necessity of the accommodation to remedy discrimination.

233.    By applying standard variance criteria rather than reasonable accommodation standards, the City imposed a much higher and inappropriate burden on HOPE Harbor.

234.    The City required HOPE Harbor to prove that denial of first-floor residential use caused unnecessary hardship and resulted from unique property conditions, when the relevant inquiry under federal civil rights law should have been whether permitting first-floor residential use was necessary to afford persons with disabilities equal access to recovery housing.

235.    The City never engaged in any interactive process with HOPE Harbor to determine what accommodations might be feasible, what concerns the City had about the proposed use, whether those concerns could be addressed through conditions or modifications, or whether alternative sites or configurations might achieve HOPE Harbor's mission while addressing any legitimate municipal interests.

236.    On October 12, 2025, before the Planning Commission meeting at which HOPE Harbor's initial zoning permit application would be denied, HOPE Harbor sent an email to the Hillsdale City Council requesting a 90-day delay in demolition of the Camp Hope tent structure to allow the building approval process for 386 West Carleton Road to proceed.

237.    The email stated: "A 90-day delay in tearing down the tent would give the city time to approve the real building at Hope Harbor. An occupancy permit application is being sent into the building department this week... the $400 fee ready to turn in Monday."

238.    The City never responded to HOPE Harbor's October 12, 2025 request for a 90-day delay.

239.    The City never acknowledged receipt of the request, never explained why such a delay could not be granted, and never engaged with HOPE Harbor regarding how to coordinate the transition from emergency tent shelter to permanent building-based housing in a manner that would avoid displacement of vulnerable residents.

240.    Thus, HOPE Harbor had no choice but to house its residents in the building at 386 W. Carleton even though they did not yet have the permit to do so.

241.    Throughout the administrative proceedings before the Planning Commission and Zoning Board of Appeals, City officials never advised HOPE Harbor of any alternative pathway to obtain approval for recovery housing at 386 West Carleton Road or any other location in the City.

242.    City officials never suggested modifications to HOPE Harbor's proposal that might address municipal concerns while still allowing the organization to serve persons with disabilities. City officials never acknowledged that federal and state civil rights laws might require the City to make exceptions to its standard zoning rules to accommodate housing for persons with disabilities.

243.    The City's failure to provide any reasonable accommodation process, its application of inappropriate standard variance criteria to a request explicitly framed as disability accommodation, its refusal to engage in any interactive process, and its failure to respond to HOPE Harbor's requests for extensions or delays to allow orderly transition of residents all demonstrate that the City had no intention of making any accommodation to permit recovery housing in Hillsdale, regardless of federal or state legal obligations to do so.

244.    Since the denial of HOPE Harbor's use variance petition on February 25, 2026, HOPE Harbor's residents face the imminent threat of losing their home at HOPE Harbor, where they are receiving so many necessary services to support their health and recovery so that they can safely and securely establish themselves within the community.

245.    Indeed, once the right of appeal expires on March 27, 2026, 30 days after the final decision of the ZBA, it is understood that the City will immediately undertake actions to disband HOPE Harbor.

246.    If HOPE Harbor is disbanded, permanent harm will immediately befall its residents, including Plaintiffs Greenwalt and Gale, whose lives depend on HOPE Harbor and all of the therapeutic and wrap-around services it provides.

## City Officials' Endorsement and Ratification of Discriminatory Opposition

247.    Rather than acting as neutral arbiters of competing community interests or educators about legal obligations under civil rights laws, City officials took an active leadership role in opposing recovery housing for persons with disabilities.

248.    City officials adopted discriminatory community opposition, amplified it through official actions and public statements, and used the power of municipal government to achieve the

discriminatory objective of preventing persons with disabilities from accessing housing in Hillsdale.

249.    City Manager Mackie's October 31, 2024 email demonstrates that City officials had decided Camp Hope "needs to be disbanded" and communicated this decision to Ms. DesJardin, rather than working with HOPE Harbor to identify a pathway to legal operation or provide reasonable accommodations to bring the facility into compliance while continuing to serve vulnerable individuals with disabilities.

250.    City officials repeatedly made public statements that recovery housing and homeless services "should be located outside city limits" and "away from everyone else," adopting and endorsing the discriminatory sentiment expressed by community members rather than explaining that such segregation of persons with disabilities violates federal law.

251.    City Councilman Bob Flynn pushed to have Ms. DesJardin arrested for an alleged incident involving a "stray dog"—using the threat of criminal prosecution as harassment and retaliation against the operator of recovery housing for persons with disabilities.

252.    At the December 1, 2025, City Council meeting, Mr. Flynn was recognized and thanked during public comments for having orchestrated Ms. DeJardin's arrest over this stray dog incident.

253.    There have been at least three other reports in March of 2018 involving stray dogs with identified owners, but no arrests made.

254.    Therefore, arresting Ms. DesJardin over the stray dog incident was a way to harass and punish Ms. DesJardin because of her involvement with BMAK and HOPE Harbor.

255.    At a City Council meeting, a City official made a public statement that he saw no possibility of success for HOPE Harbor and Hillsdale Community Thrift "if current administration

43

isn't removed"—interpreted by Plaintiffs as a demand that Ms. DesJardin be removed as Executive Director as a condition of permitting recovery housing to operate.

256. This statement demonstrates that City officials' opposition was personal and retaliatory toward Ms. DesJardin for her advocacy on behalf of persons with disabilities, rather than based on legitimate land use concerns.

257. Throughout the administrative proceedings regarding Camp Hope's closure and HOPE Harbor's permit applications, Councilman Joshua Paladino joked publicly about imposing "daily citations" on HOPE Harbor and using fine revenue to "fund downtown events," treating discriminatory enforcement as a source of humor and municipal revenue rather than recognizing the civil rights violations inherent in their actions.

258. Despite extensive documentation of Camp Hope's success in serving over 330 individuals and achieving a success rate over 60% in transitioning residents to stable sobriety and permanent housing, no City official ever publicly acknowledged these positive outcomes or recognized Camp Hope's contribution to addressing homelessness and substance use disorders in Hillsdale County.

259. Yet, a City building inspector's notes from October 2024 acknowledged that "CAMP HOPE WAS CONSTRUCTED AS A TEMPORARY ANSWER TO THE NEED FOR SHELTER FACILITIES FOR UNHOUSED PERSONS WHILE THE MAYOR'S HOMELESS TASK FORCE EXPLORED LONG-TERM SOLUTIONS."

260. This official acknowledgment demonstrates that the City recognized Camp Hope served a critical community need and was meant to be temporary pending identification of permanent solutions—yet the City took no action to help identify or facilitate such permanent solutions and instead forced closure of the emergency shelter without providing any alternative.

261. City officials coordinated enforcement actions and public statements with residents opposed to recovery housing.

262. At the May 22, 2025 Public Safety Committee meeting, City officials received a lengthy litany of complaints from residents of the neighboring Apple Run apartment complex and other community members, and responded by directing code enforcement to increase enforcement pressure on Camp Hope rather than explaining the legal protections afforded to recovery housing or investigating whether the complaints had any factual basis.

263. At the October 20, 2025 City Council meeting, one Apple Run resident, Howard Spence, demanded that the City get rid of Camp Hope and asked "How long is it going to be this time?"

264. City officials allowed Mr. Spence and Cindy Pratt (City Council member from 2019 to 2024), along with other opponents of recovery housing to make inflammatory and inaccurate statements at public meetings without correction or response.

265. At the same October 20, 2025, meeting, City Manager Mackie contradicted the professional Orkin inspection report finding no evidence of rodents and thereby demonstrated that City officials were prepared to dispute factual evidence in order to justify their predetermined decision to close Camp Hope.

266. City officials supported and publicly praised Share the Warmth, another homeless shelter organization operating in Hillsdale, while simultaneously opposing and obstructing HOPE Harbor.

267. Unlike HOPE Harbor, Share the Warmth only runs during the winter months and only opens between 4:30 pm and 8:00 am; therefore, it is not comparable to HOPE Harbor in the scope or scale of its year-round, 24-7 services.

45

268.    Nonetheless, multiple City Council members have publicly stated "they support STW" (Share the Warmth), which is a warming center allowed to operate without a permit during winter months only as a shelter, yet no City official has ever "gone on record supporting" HOPE Harbor, despite the fact that HOPE Harbor served a distinct population with different needs and has been the City's only recovery housing facility requiring sobriety and drug testing.

269.    The differential treatment between Share the Warmth and HOPE Harbor demonstrates that City officials' opposition was not based on general objection to homeless services, but rather specifically targeted housing for persons with substance use disorders—a protected class under federal and state disability rights laws.

**Disparate Treatment: The City Permits Similar and More Intensive Uses
While Denying HOPE Harbor its Request for a Reasonable Accommodation**

270.    The City's denial of HOPE Harbor's applications to operate recovery housing at 386 West Carleton Road cannot be explained by neutral application of zoning ordinances or legitimate land use concerns.

271.    Rather, the denial is part of a pattern of disparate treatment in which the City permits, facilitates, and supports comparable or more intensive residential and commercial uses while categorically prohibiting housing for persons with disabilities in recovery from substance use disorders.

272.    The most stark example of disparate treatment is the City's differing responses to HOPE Harbor's proposals for two properties in the identical B-3 (General Business) zoning district located immediately adjacent to one another on the same block of West Carleton Road.

273.    According to communications between HOPE Harbor and City officials, the City indicated it was willing to permit HOPE Harbor to operate recovery housing at 390 West Carleton Road—the property containing the larger building that houses Hillsdale Community Thrift. Yet

the City denied HOPE Harbor's application to operate the identical use at 386 West Carleton Road —the adjacent property containing a smaller 904-square-foot building.

274.    390, 388 and 386 West Carleton Road are in the B-3 General Business zoning district. Both properties are part of the same parcel under common ownership. Both properties are subject to identical zoning regulations. There is no rational, nondiscriminatory basis for permitting recovery housing at one property while prohibiting it at the adjacent property in the same zoning district.

275.    The only explanation for this differential treatment is that City officials do not adhere to strict interpretation of their zoning code and thus engage in discriminatory, or at least arbitrary enforcement of their code.

276.    Share the Warmth is a homeless shelter organization that operates seasonal warming center services from November 1 through April 1 each year, providing emergency overnight shelter to homeless individuals during winter months.

277.    But Share the Warmth operates without a permit out of church facilities in Hillsdale and does not allow anyone inside between 8:00 am and 4:30 pm.

278.    While STW may provide sleeping accommodations for up to 40 individuals— significantly more than HOPE Harbor's proposed capacity of 16 residents—it does so without the necessary wrap-around services and fully-year, 24-7 operations necessary to meet the needs of persons like Plaintiffs Greenwalt and Gale with addiction and other disabilities to keep them sober, safe and healthy.

279.    Share the Warmth has operated for multiple years without obtaining any zoning permits, special use permits, or variances from the City.

280.     Share the Warmth has never been required to submit detailed site plans, obtain Planning Commission approval, or undergo the extensive review process imposed on HOPE Harbor.

281.     Share the Warmth receives public support and praise from City Council members who have publicly stated "they support STW" and City officials have never subjected Share the Warmth to the code enforcement actions, permit denials, or demands for detailed operational information imposed on HOPE Harbor.

282.     The differential treatment between Share the Warmth (40-person capacity, operates without permits, receives City support) and HOPE Harbor (16-person capacity, denied despite extensive permit applications and documentation, subjected to aggressive code enforcement) demonstrates that the City's actions are not based on neutral application of occupancy limits or permit requirements, but rather discriminatory targeting of housing specifically for persons with substance use disorders and other disabilities.

283.     The Apple Run apartment complex is a 40-unit residential facility located directly adjacent to and behind the properties at 386-390 West Carleton Road where HOPE Harbor sought to operate.

284.     Apple Run operates as conventional rental housing in close proximity to the B-3 zoning district where HOPE Harbor's proposed facility would be located.

285.     Despite the fact that Apple Run represents a far more intensive residential use (40 units) than HOPE Harbor's proposed 16-person transitional housing facility, the City has never suggested that Apple Run's proximity raises concerns about residential density, compatibility with surrounding uses, or any of the other objections raised to HOPE Harbor's proposal.

48

286. Residents and management of Apple Run were among the most vocal opponents of HOPE Harbor at City meetings and were instrumental in circulating false allegations about Camp Hope causing rat infestations.

287. Rather than dismissing these discriminatory complaints or explaining that residential proximity to persons with disabilities cannot be a basis for zoning decisions, City officials elevated and responded to Apple Run residents' concerns while denying HOPE Harbor's permit applications.

288. According to City Council agendas and meeting minutes from early 2026, the City approved multiple rezoning applications and zoning variances for other properties during the same time period when HOPE Harbor's applications were being denied. For example, the March 2, 2026 City Council agenda included an "Ordinance Amendment to Rezone 120 S Broad St," demonstrating the City's willingness to accommodate zoning changes for other applicants while categorically refusing any accommodation for recovery housing.

289. In communications and meeting notes, HOPE Harbor documented that recent zoning changes approved by the City included "granted business in R-1" (permitting commercial use in a residential zoning district) while simultaneously denying HOPE Harbor's request to permit residential use in the B-3 commercial district. This inconsistent treatment—permitting commercial uses to encroach on residential districts while prohibiting residential uses in commercial districts —demonstrates selective application of zoning regulations to disadvantage housing for persons with disabilities.

290. The City approved a rezoning to convert a property from single-family residential use to a four-unit rental property, demonstrating willingness to increase residential density and multi-family housing in residential zones, while simultaneously denying HOPE Harbor's request

to operate a 16-person recovery housing facility in a commercial zone already characterized by mixed uses.

**Pretextual Reasons and Selective Enforcement**

291.    The stated reasons advanced by the City for denying HOPE Harbor's applications —that the B-3 zoning district prohibits ground-floor residential use and that the proposed use does not comply with the strict letter of the zoning ordinance—are pretextual justifications masking discriminatory intent to exclude persons with disabilities from housing in Hillsdale.

292.    The City's reliance on the prohibition of "ground-floor residential use" in the B-3 district as an absolute bar to HOPE Harbor's proposed recovery housing is contradicted by the presence of other residential uses in and near the B-3 district that the City has tolerated or approved. The Apple Run apartment complex—a 40-unit residential facility—is located immediately adjacent to the subject property and continues to operate without any suggestion from the City that residential use is inappropriate in that location.

293.    HOPE Harbor's proposed transitional housing facility is substantially similar to other permitted and conditionally permitted uses in the B-3 district, including hotels, motels, and mixed-use buildings.

294.    The City's categorical prohibition of any residential use on the ground floor of a single-story building in the B-3 district has the effect—whether intended or not—of absolutely foreclosing recovery housing in such buildings, with no opportunity for reasonable accommodation to permit housing for persons with disabilities who cannot access second-floor housing due to mobility disabilities or other functional limitations.

295.    The City claimed concerns about "concentration" of group homes and recovery housing in Hillsdale but never provided any evidence supporting such concerns.

296.    The City demolished the Camp Hope tent structure on October 16, 2025, citing that it was an unpermitted temporary structure that did not comply with building codes. Yet the City has tolerated Share the Warmth operating out of church facilities for multiple years without requiring permits, site plan approvals, or compliance with the same building and occupancy codes applied to Camp Hope.

297.    The City's selective enforcement of permit requirements—strictly applied to HOPE Harbor while not applied to Share the Warmth or other temporary or seasonal housing—demonstrates that enforcement decisions were driven by discriminatory targeting of housing for persons with substance use disorders rather than consistent application of building and zoning codes.

298.    The pattern of disparate treatment, the endorsement of discriminatory community opposition, the imposition of pretextual requirements and selective enforcement, and the coordination between City officials and opponents of recovery housing all demonstrate that the City's actions were motivated by discriminatory intent to exclude persons with disabilities from accessing housing in Hillsdale, in violation of the Fair Housing Act, the Americans with Disabilities Act, and Michigan's Persons with Disabilities Civil Rights Act.

**INJURIES TO PLAINTIFFS**

**Injuries to HOPE Harbor and BMAK**

299.    As a result of Defendant's unlawful actions, Plaintiffs HOPE Harbor and BMAK have suffered, continue to suffer, and will in the future suffer, great and irreparable loss and injury, including, but not limited to economic losses, injury to reputation, interference with their ability to carry out their missions, and deprivation of their ability to serve their clients.

300.    Defendant's actions have exposed HOPE Harbor and BMAK to community hostility and to adverse and false understandings of persons who are in recovery from substance

51

use disorders whom they serve. Community members and City officials have publicly characterized HOPE Harbor's residents as dangerous, undesirable, and unsuitable for living within city limits, based on discriminatory stereotypes about persons with substance use disorders.

301.    HOPE Harbor and BMAK have experienced significant hardship due to Defendant's discriminatory hostility directed at its plans to operate sober transitional housing in Hillsdale, Defendant's endorsement and ratification of disability-based community opposition to recovery housing, and Defendant's past and ongoing efforts to prevent HOPE Harbor from operating at 386 West Carleton Road and elsewhere within the City.

302.    As BMAK's revenues provide essential funding for HOPE Harbor's operations, its reputation and operations have also been severely harmed by the City's animus against its sister organization HOPE Harbor.

303.    As a result of Defendant's actions, HOPE Harbor has been forced to shut down its emergency tent shelter operations at Camp Hope and has been prohibited from opening its permanent facility at 386 West Carleton Road, obstructing HOPE Harbor from fulfilling its mission and harming its ongoing operations to provide sober transitional housing services to persons needing recovery housing options in Hillsdale County.

304.    As a result of Defendant's actions, BMAK has seen precipitous declines in sales and thus cannot maintain its essential support for its clients and HOPE Harbor's clients. The loss of this revenue stream has crippled HOPE Harbor's financial ability to sustain operations and serve persons with disabilities.

305.    HOPE Harbor and BMAK have incurred substantial economic losses as a direct result of Defendant's discriminatory conduct. These economic losses include severe declines in thrift sales, the demolition of the tent that cost over $6,000 to procure and install, fines and

demolition costs related to the tent structure, planning fees to an architect for preparation of the HOPE Harbor reasonable accommodation permit, along with over $10,000 in furnishings for the building at 386 W. Carleton.

306.   Should HOPE Harbor not be allowed to operate at 386 W. Carleton street, BMAK and HOPE Harbor will have to carry significant costs on that space without being able to operate it.

307.   As a result of negative publicity and the City's discriminatory opposition to HOPE Harbor, the organization has been unable to secure grants and donations that would otherwise be available to support recovery housing operations. HOPE Harbor has been blocked from accessing county opioid committee funding despite the critical need for recovery housing services in Hillsdale County. Potential donors and grantors have been deterred by the City's public campaign against HOPE Harbor and the uncertainty surrounding whether the organization will be permitted to operate.

308.   In March 2025, BMAK had to relinquish its warehouse lease at 90 West Fayette Street in Hillsdale, which had been used for storage and occasional thrift store sales. The lease was not renewed due to financial strain caused by the collapse of thrift store revenues and the controversy surrounding Camp Hope. This loss further diminished HOPE Harbor's operational capacity and revenue-generating ability.

309.   Defendant's efforts to preclude the operation of and undermine HOPE Harbor's attempts to establish recovery housing have caused significant reputational harm to the organization, putting it at a disadvantage with respect to future service contracts, charitable contributions, referral relationships with treatment providers, and community partnerships. BMAK and HOPE Harbor's reputation in the community and among potential supporters has been

severely damaged by the City's public vilification campaign and the false allegations—including unfounded claims of rat infestations—that City officials allowed to circulate without correction.

310. As a result of Defendant's discriminatory actions, HOPE Harbor has incurred substantial administrative and operational costs associated with the obstruction and delay of its efforts to open recovery housing at 386 West Carleton Road. These costs include legal fees, engineering and architectural expenses, time spent preparing and revising permit applications, time spent responding to the City's extensive and burdensome documentation requirements, and resources diverted to attending Planning Commission and Zoning Board of Appeals hearings.

311. HOPE Harbor has been forced to divert its scarce resources away from its core mission of serving persons with disabilities and toward fighting the City's discriminatory enforcement actions.

312. Instead of focusing on case management, peer support, employment assistance, and helping residents transition to permanent housing, HOPE Harbor has been compelled to devote substantial time, effort, and financial resources to navigating the City's zoning bureaucracy, defending against code enforcement actions, and attempting to overcome discriminatory barriers to operation.

313. As a direct result of Defendant's actions, HOPE Harbor has had to severely curtail its operations due to limited funding. Yet demand for HOPE Harbor's services continues to exist —persons with substance use disorders continue to complete initial treatment and need transitional sober living housing.

314. Each day that HOPE Harbor will be closed after March 27, 2026, represents another day that individuals with disabilities are denied access to the supportive housing necessary for successful recovery.

315. HOPE Harbor successfully operated for over two years serving more than 330 individuals, with a success rate of over 60% in helping residents achieve stable sobriety and permanent housing. The imminent forced closure of this effective program has eliminated the only co-ed sober transitional housing facility in Hillsdale County, leaving a critical gap in the continuum of care for persons with substance use disorders.

### Injuries to Melissa DesJardin

316. As a result of Defendant's unlawful actions, Plaintiff Melissa DesJardin has suffered, continues to suffer, and will in the future suffer, great and irreparable loss and injury, including severe emotional distress, economic losses, and reputational harm.

317. Ms. DesJardin suffered a severe panic attack that required hospitalization as a result of the City's escalating efforts to destroy BMAK and HOPE Harbor.

318. In April of 2025, she was hospitalized for eight to nine hours and required time off from her duties at HOPE Harbor and Hillsdale Community Thrift for rest and recovery. The stress caused by the City's discriminatory campaign against HOPE Harbor directly caused Ms. DesJardin's medical crisis. Her family life has also suffered due to the stress of the City's relentless discriminatory actions, including bullying of her children.

319. Ms. DesJardin has been subjected to ongoing court proceedings over municipal fines and code violations related to Camp Hope and HOPE Harbor. She has been forced to appear in Hillsdale County District Court on multiple occasions to defend against the City's enforcement actions, incurring stress, lost time, and the humiliation of being treated as a code violator rather than as a nonprofit executive providing critical services to persons with disabilities.

320. Ms. DesJardin has suffered severe emotional distress, humiliation, and reputational harm from being publicly attacked and vilified by City officials and community members as living in a "drug house" and endangering the community. City Councilmembers Robert Socha and Felicia

Finch have publicly stated that they see no possibility of success for HOPE Harbor if Ms. DesJardin remains as Executive Director, effectively demanding her removal as a condition of permitting recovery housing to operate. These public attacks on Ms. DesJardin's character and leadership have caused her profound emotional injury.

321. Ms. DesJardin has incurred personal financial losses as a result of the City's actions, including expenses related to defending against code enforcement actions, time lost from employment, and costs associated with attempting to maintain operations of Hillsdale Community Thrift and HOPE Harbor in the face of the City's discriminatory campaign.

322. The collapse of BMAK's store revenues and HOPE Harbor's financial crisis has also directly impacted Ms. DesJardin's livelihood.

**Injuries to HOPE Harbor Residents**

323. Residents and clients of Camp Hope and HOPE Harbor such as Breanna Greenwalt and Brent Gale will suffer catastrophic injuries from the dissolution of HOPE Harbor and their home at 386 W. Carleton Rd.

324. Ms. Greenwalt has diabetes and substance use disorder, and it is only in the 10 months or so of residence at Camp Hope and then HOPE Harbor that she has been able to stabilize her diabetes treatments, remain sober, hold down a job, and work with success toward the now-obtainable goal of independent living.

325. Mr. Gale has mental health disorders and substance use disorder, and it is only in his 10 months or so of residence at Camp Hope and HOPE Harbor that he has had the supportive environment necessary to maintain sobriety and develop a healthy path regarding his psychiatric disabilities.

326. If the City disbands HOPE Harbor after the right to appeal the ZBA decision expires on March 27, 2026, Ms. Greenwalt and Mr. Gale will face the devastating reality of returning to

the streets where they will lack the stable housing and wrap-around therapeutic support services that have allowed them to live sober, healthy lives.

327. It is not an exaggeration to state that Ms. Greenwalt's and Mr. Gale's lives depend on HOPE Harbor's operation.

328. Just over past several months as Camp Hope was demolished and HOPE Harbor has been denied its applications for a reasonable accommodation to allow operation at 386 W. Carleton Road, Ms. Greenwalt and Mr. Gale have suffered severe emotional distress arising from the fear and uncertainty for their housing and the dignitary harm of being disparaged and cruelly debased by public officials and neighbors.

329. In addition to the injuries to Ms. Greenwalt and Mr. Gale, so many others like them have been and will be similarly harmed by the City's actions.

330. Defendant's actions have sent a clear message to persons with disabilities in Hillsdale that they are unwelcome within city limits, that their housing needs do not matter, and that discriminatory animus toward persons in recovery from substance use disorders is acceptable and will be ratified by municipal government.

331. This message has stigmatized and demoralized an entire class of persons protected by federal and state civil rights laws.

332. Individuals with mobility disabilities and other physical disabilities who require accessible first-floor housing have been categorically excluded from any possibility of accessing recovery housing at 386 West Carleton Road due to the City's refusal to accommodate the fact that the building has no second floor.

333. The City's rigid application of its zoning ordinance prohibiting ground-floor residential use, without any individualized assessment of disability-related needs for accessible

57

housing, has denied persons with physical disabilities equal opportunity to access recovery housing.

334. Unless enjoined, Defendant and its agents will continue to engage in unlawful discrimination, with the purpose and effect of preventing HOPE Harbor from providing housing to individuals with disabilities in the City of Hillsdale, preventing HOPE Harbor from fulfilling its central mission of providing sober transitional housing for persons recovering from substance use disorders and other disabilities in Hillsdale, and denying persons with disabilities equal opportunity to access recovery housing.

335. Plaintiffs have no adequate remedy at law and are now suffering, and will continue to suffer, irreparable injury from Defendant's discriminatory conduct unless relief is provided by this Court. The injuries to BMAK and HOPE Harbor's mission, to Melissa DesJardin's well-being, to Breanna Greenwalt and Brent Gale's health and well-being, and to all other persons with disabilities seeking recovery housing cannot be fully remedied by monetary damages alone. Only injunctive relief compelling the City to permit HOPE Harbor to operate can restore the opportunity for persons with disabilities to access recovery housing in Hillsdale.

336. Defendant's conduct has been willful, intentional, and taken with reckless disregard for the civil rights, physical and emotional health, personal safety, reputation, and dignity of HOPE Harbor's current and prospective residents. The City has acted with full knowledge of its obligations under the Fair Housing Act, the Americans with Disabilities Act, and Michigan's Persons with Disabilities Civil Rights Act, yet has deliberately chosen to discriminate against persons with disabilities rather than fulfill its legal duty to provide reasonable accommodations.

337. As a proximate result of Defendant's conduct, Plaintiffs have suffered, are continuing to suffer, and will in the future suffer irreparable loss and injury. Plaintiffs are therefore

58

entitled to declaratory judgment, preliminary and permanent injunctive relief, compensatory damages, and all other relief requested herein.

## COUNT I

### Discrimination in Making Housing Unavailable 42 U.S.C. § 3604(f)(1)

338.    Plaintiffs re-allege and incorporate by reference all paragraphs set forth above, as if fully set forth herein.

339.    The prospective residents of HOPE Harbor's proposed recovery housing facility at 386 West Carleton Road are individuals with disabilities within the meaning of 42 U.S.C. § 3602(h).

340.    Defendant has discriminated against Plaintiffs by refusing to make housing available to persons with disabilities at the 386 West Carleton Road property.

341.    The City's denial of HOPE Harbor's zoning application on November 19, 2025, refusal to grant a reasonable accommodation or use variance on February 25, 2026, demolition of the Camp Hope temporary housing structure on October 16, 2025, and imposition of categorical barriers to recovery housing have had the purpose and effect of preventing housing from being available to persons in recovery from substance use disorders and other disabilities in Hillsdale.

342.    Defendant's actions constitute unlawful discrimination in violation of 42 U.S.C. § 3604(f)(1) and have caused Plaintiffs' injuries as detailed above.

## COUNT II

### Discrimination in Terms, Conditions, and Privileges. 42 U.S.C. § 3604(f)(2)

343.    Plaintiffs re-allege and incorporate by reference all paragraphs set forth above, as if fully set forth herein.

344.    Defendant has discriminated in the terms, conditions, privileges, and services of housing based on the disability of HOPE Harbor's intended residents.

59

345.    As alleged in more detail above, the City has subjected HOPE Harbor to burdensome application requirements, costs, and procedural obstacles not imposed on other housing providers or commercial applicants.

346.    As alleged in more detail above, the City has applied its zoning ordinances in a discriminatory manner by permitting comparable or more intensive uses while denying HOPE Harbor's application.

347.    As alleged in more detail above, the City has denied equal opportunity to use and enjoy housing because the intended occupants are persons with disabilities.

348.    Defendant's actions constitute unlawful discrimination in violation of 42 U.S.C. § 3604(f)(2) and have caused Plaintiffs' injuries as detailed above.

## COUNT III

**Refusal to Make Reasonable Accommodations 42 U.S.C. § 3604(f)(3)(B)**

349.    Plaintiffs re-allege and incorporate by reference all paragraphs set forth above, as if fully set forth herein.

350.    Defendant has refused to make reasonable accommodations in rules, policies, practices, and services when such accommodations are necessary to afford persons with disabilities equal opportunity to use and enjoy housing.

351.    HOPE Harbor requested specific accommodations, including: (1) a waiver of the B-3 ordinance's prohibition of ground-floor residential use, or grant of a use variance, to permit the proposed recovery housing in a single-story building with no second floor; (2) reasonable extensions of demolition deadlines to allow orderly transition of residents from temporary tent shelter to the permanent building; and (3) treatment of the proposed sober transitional housing facility as substantially similar to permitted boarding houses and adult foster care homes.

352.    The requested accommodations are "reasonable" under applicable legal standards because they would not fundamentally alter the City's zoning scheme or impose undue financial or administrative burdens on the City.

353.    The building at 386 West Carleton Road already exists.

354.    The proposed use is similar to permitted uses including motels and apartment buildings in the zone and directly adjacent to the HOPE Harbor site.

355.    Granting a variance or accommodation imposes no cost on the City—only administrative action to recognize that rigid application of the ground-floor residential prohibition effectively forecloses all residential use in a single-story building.

356.    Moreover, elected and appointed City officials and the City's Homelessness Task Force, unlawfully, announced the City's desire to prevent operation of any sober living or recovery residence in any of the City's residential zones.

357.    HOPE Harbor was denied the accommodation to allow for its recovery residence to be allowed in a business zone.

358.    These facts strongly suggest that Hillsdale would prefer not to have any residents in its city who are persons with disabilities who need the supportive and therapeutic services of a recovery residence.

359.    The requested accommodations are "necessary" because without them, persons with disabilities are denied equal opportunity to live in the community.

360.    HOPE Harbor is the only co-ed sober transitional housing facility in Hillsdale. Persons with mobility disabilities cannot access second-floor housing and are categorically excluded by the City's refusal to permit first-floor residential use in a building with no second

floor. But for the requested accommodations, persons with disabilities will be denied equal opportunity to enjoy recovery housing in Hillsdale.

361.    Defendant's actions constitute unlawful discrimination in violation of 42 U.S.C. § 3604(f)(3)(B) and have caused Plaintiffs' injuries as detailed above.

## <u>COUNT IV</u>

### Interference, Coercion, and Intimidation 42 U.S.C. § 3617

362.    Plaintiffs re-allege and incorporate by reference all paragraphs set forth above, as if fully set forth herein.

363.    Defendant has interfered with, coerced, intimidated, and threatened Plaintiffs in the exercise or enjoyment of rights granted by the Fair Housing Act. Defendant's specific acts of interference include: endorsing and amplifying discriminatory opposition at the May 22, 2025 Public Safety Committee meeting from which Plaintiffs were deliberately excluded; making and allowing discriminatory public statements characterizing persons with disabilities as unsuitable for living within city limits; selectively enforcing zoning and building codes against HOPE Harbor while permitting comparable or more intensive uses by others; demolishing the Camp Hope tent shelter on October 16, 2025, displacing 25 adults and 3 children without providing alternative housing; and engaging in a coordinated campaign to prevent recovery housing from operating in Hillsdale through aggressive code enforcement, permit denials, and public vilification.

364.    Defendant's actions were taken in direct response to Plaintiffs' assertion of their rights under the Fair Housing Act to operate housing for persons with disabilities and to HOPE Harbor's advocacy on behalf of persons in recovery from substance use disorders.

365.    Defendant's actions constitute unlawful interference in violation of 42 U.S.C. § 3617 and have caused Plaintiffs' injuries as detailed above.

366.    Defendant's conduct under all four counts was intentional, willful, and taken with reckless disregard for the civil rights, health, safety, and dignity of Plaintiffs and persons with disabilities seeking recovery housing in Hillsdale.

### COUNT V

**Violation of Title II of the Americans with Disabilities Act 42 U.S.C. §§ 12131-12132**

367.    Plaintiffs re-allege and incorporate by reference all paragraphs set forth above, as if fully set forth herein.

368.    Defendant City of Hillsdale is a "public entity" within the meaning of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131(1).

369.    The prospective residents of HOPE Harbor's proposed recovery housing facility at 386 West Carleton Road are "qualified individuals with disabilities" within the meaning of Title II of the ADA. Persons in recovery from substance use disorders, including alcoholism and drug addiction, have disabilities that substantially limit one or more major life activities. More than 90% of HOPE Harbor's residents have disabilities, including substance use disorders, mental health conditions, and physical disabilities including mobility impairments.

370.    Title II of the Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The phrase "services, programs, or activities" encompasses virtually everything a public entity does, including the administration of zoning, planning, and code enforcement programs.

371.    Defendant has violated Title II of the ADA by committing the following discriminatory practices:

a.    Excluding qualified individuals with disabilities from participation in, and denying them the benefits of, services, programs, and activities of the City, specifically the zoning approval process and the ability to reside in community-based housing in Hillsdale, in violation of 42 U.S.C. §§ 12131 and 12132;

b.    Subjecting persons with disabilities to discrimination in the administration of the City's zoning, planning, and code enforcement programs, in violation of 42 U.S.C. §§ 12131 and 12132; and

c.    Refusing to make reasonable modifications in policies, practices, and procedures when such modifications are necessary to afford persons with disabilities equal access to the City's programs and services, specifically the zoning variance and permit processes, in violation of 42 U.S.C. §§ 12131 and 12132.

372.    Defendant's zoning ordinances, as applied to HOPE Harbor, discriminate against persons with disabilities by prohibiting and unduly restricting community-based housing for persons in recovery from substance use disorders. The City's categorical prohibition of ground-floor residential use in the B-3 zoning district, as applied to a single-story building with no second floor, effectively forecloses any possibility of recovery housing at 386 West Carleton Road and denies persons with mobility disabilities access to housing that nondisabled persons could access.

373.    Title II of the ADA and its implementing regulations require public entities to administer their services, programs, and activities "in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Community-based sober living housing of the type proposed by HOPE Harbor is precisely such an integrated setting,

64

providing persons with disabilities the opportunity to live in residential neighborhoods with access to employment, healthcare, and community resources rather than being segregated in institutional settings or excluded from the community entirely. Defendant's refusal to permit HOPE Harbor to operate recovery housing violates this integration mandate.

374.    Defendant has violated Title V of the ADA, 42 U.S.C. § 12203, by retaliating against and discriminating against Plaintiffs because they opposed acts made unlawful by the ADA and assisted individuals with disabilities in exercising their rights. Defendant's retaliatory conduct includes:

   a.    Escalating code enforcement actions and imposing fines after HOPE Harbor filed a complaint with the U.S. Department of Housing and Urban Development on February 19, 2026;

   b.    Continuing to deny Plaintiffs' applications for zoning permits and variances after Plaintiffs asserted their rights under the ADA and requested reasonable accommodations based on disability;

   c.    Engaging in ongoing persecution of Melissa DesJardin through court proceedings, fines totaling over $3,500 in demolition costs and penalties, and public vilification for her advocacy on behalf of persons with disabilities; and

   d.    Making public statements demanding Ms. DesJardin's removal as Executive Director as a condition of permitting recovery housing to operate, in retaliation for her opposition to the City's discriminatory practices.

375.    As a direct and proximate result of Defendant's violations of the ADA, Plaintiffs have suffered economic harm including substantial fines, demolition costs, lost revenue, and

diverted resources; emotional distress; deprivation of civil rights; frustration of HOPE Harbor's mission to provide recovery housing; and denial of housing opportunities for persons with disabilities. Defendant's conduct has caused and continues to cause irreparable injury to Plaintiffs and to qualified individuals with disabilities seeking recovery housing in Hillsdale County.

376. Defendant's conduct in violation of the Americans with Disabilities Act was intentional, willful, wanton, and taken with reckless disregard for the civil rights, health, safety, and dignity of Plaintiffs and persons with disabilities. Defendant's discriminatory actions were motivated by animus against persons with substance use disorders and by deliberate responsiveness to discriminatory opposition, demonstrating egregiousness warranting both compensatory and punitive relief.

## COUNT VI

**Violation of Michigan Persons with Disabilities Civil Rights Act, MCL §§ 37.1301-1303**

377. Plaintiffs re-allege and incorporate by reference all paragraphs set forth above, as if fully set forth herein.

378. The Michigan Persons with Disabilities Civil Rights Act (PDCRA), MCL §§ 37.1301-1303, prohibits public entities from denying fair and equitable access to public services because of disabilities.

379. Zoning codes and permits for land use are public services governed by the PWDCRA.

380. Defendant has violated the PDCRA, MCL §§ 37.1301-1303, by committing the following discriminatory practices:

      a. Denying individuals the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a public service

66

because of disability that is unrelated to the individuals' ability to utilize and benefit from such services, in violation of MCL § 37.1302(a);

b.  Denying HOPE Harbor and persons with disabilities access to the City's zoning approval processes, permit applications, and variance procedures on the basis of the disabilities of HOPE Harbor's prospective residents, treating recovery housing for persons with substance use disorders less favorably than comparable residential and commercial uses; and

c.  Printing, circulating, posting, and causing to be published statements, advertisements, and communications indicating that the full and equal enjoyment of the City's services will be refused or denied to individuals because of disability, and that the presence of persons with disabilities is objectionable, unwelcome, and undesirable, in violation of MCL § 37.1303, including official statements that recovery housing "should be outside city limits, away from everyone else" and endorsement of discriminatory community opposition characterizing persons with disabilities as unsuitable for living within Hillsdale.

381.  As a direct and proximate result of Defendant's violations of the Michigan Persons with Disabilities Civil Rights Act, Plaintiffs have suffered economic harm, emotional distress, deprivation of civil rights under state law, frustration of HOPE Harbor's mission, and denial of housing opportunities for persons with disabilities in Hillsdale.

382.  The state law claims provide essential remedial authority and ensure that Plaintiffs' rights under Michigan law are vindicated even if federal claims face unexpected procedural challenges.

## COUNT VII

**Violation of Michigan Persons with Disabilities Civil Rights Act, MCL §§ 37.1602**

383. Plaintiffs re-allege and incorporate by reference all paragraphs set forth above, as if fully set forth herein.

384. The PWDCRA, MCL 37.1602 prohibits retaliation and discrimination against anyone who has sought to pursue their rights under the PWDCRA or opposed a violation of the PWDCRA.

385. MCL 37.1602 also prohibits individuals from aiding or abetting others in violation of the PWDCRA.

386. Defendant has violated MCL 37.1602 by:

 a. Retaliating and otherwise discriminating against Plaintiffs because they opposed acts made unlawful by the PDCRA and because they assisted and participated in investigations and proceedings related to disability discrimination, including retaliatory code enforcement and permit denials following HOPE Harbor's filing of discrimination complaints with HUD and the Michigan Department of Civil Rights, in violation of MCL § 37.1506; and

 b. Coercing, intimidating, threatening, and interfering with Plaintiffs' exercise and enjoyment of rights granted or protected by the PDCRA, including demolishing the Camp Hope tent structure, imposing escalating fines and court proceedings, and engaging in a coordinated campaign of obstruction to prevent recovery housing from operating in Hillsdale, in violation of MCL § 37.1506.

387.    As a result of Defendant's unlawful acts, Plaintiffs have suffered economic damages, emotional distress and dignitary harms, and face the irreparable harm that will arise from the City's imminent disbanding of HOPE Harbor after the right to appeal period ends on March 27, 2026.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A.    Enter a declaratory judgment that Defendant's actions violate the Fair Housing Act, 42 U.S.C. §§ 3604(f)(1), (f)(2), (f)(3)(B), and 3617, the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12132, 12203, and Michigan's Persons with Disabilities Civil Rights Act, MCL §§ 37.1301-1303, 37.1602, and that HOPE Harbor has the right to operate sober transitional housing at 386 West Carleton Road in Hillsdale, Michigan;

B.    Enter preliminary and permanent injunctions enjoining Defendant from: (1) enforcing zoning ordinances, codes, or policies in a manner that discriminates against persons with disabilities or denies reasonable accommodations; (2) ordering Defendant to grant HOPE Harbor all necessary approvals, permits, variances, and accommodations to operate sober transitional housing at 386 West Carleton Road, including waiving the B-3 ground-floor residential prohibition or granting a use variance; (3) ordering Defendant to cease all enforcement actions, fines, and penalties against HOPE Harbor and BMAK Charity Thrifts related to the subject properties; (4) ordering Defendant to vacate or forgive all outstanding fines, costs, and demolition charges assessed against Plaintiffs; (5) ordering Defendant to implement policies and procedures ensuring compliance with federal and state fair housing and disability rights laws, including adopting a formal reasonable accommodation procedure; (6) ordering Defendant to provide training to City officials, staff, Planning Commission, and Zoning Board of Appeals on their obligations under the

FHA and ADA regarding housing for persons with disabilities; and (7) retaining jurisdiction to ensure compliance with the injunction;

C.      Award compensatory damages to BMAK and HOPE Harbor for economic losses including demolition costs, fines paid, architect fees, bunk bed purchase, land contract payments, lost revenue, lost grants and donations, and costs incurred responding to Defendant's discrimination; operational harm, reputational damage, and frustration of mission; to Melissa DesJardin for economic losses, emotional distress, humiliation, reputational harm, and medical expenses related to stress-induced hospitalization; and all other direct and consequential damages proven at trial;

D.      Award punitive damages against Defendant in an amount sufficient to punish Defendant's intentional, willful, malicious, and reckless conduct and to deter Defendant and other municipalities from engaging in similar discrimination in the future, given the deliberate nature of Defendant's campaign, the endorsement of discriminatory opposition, the vulnerable population harmed, and the ongoing refusal to comply with federal law;

E.      Award prejudgment interest on all damages from the date of accrual at the statutory rate;

F.      Award Plaintiffs their reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 3613(c)(2), 42 U.S.C. § 12205, and any applicable state law provisions; and

G.      Order such other and further relief as the Court deems just and equitable.

The undersigned Plaintiffs hereby aver and avow under penalty of perjury that all facts and allegations made in this Complaint are the whole truth and have nothing further to state.

On behalf of BMAK Charity Thrifts and HOPE Harbor

Date: 3/23/26

Keri Jo Stewart, Chair of Board

NOTARY:                    3/23/2026

GLORIA ANN BOND
NOTARY PUBLIC, BRANCH COUNTY, MI
My Commission Expires 08/25/2028
Acting in the County of Hillsdale

71

The undersigned Plaintiffs hereby aver and avow under penalty of perjury that all facts and allegations made in this Complaint are the whole truth and have nothing further to state.

_____     Date: 3/23/26

Melissa DesJardin

NOTARY:

Before me, Tristan Leightartline a Notary Public in and for
_Collier_ County, State of Florida.
Personally appeared before me by means of [✓] physical
presence or [ ] remote online notariz_tion Melissa
Desjardin and he/she/they being first duly sworn by me upon
his/her/their oath, says that the facts alleged in the forgoing
instruments are true.

(Signed) _____
NOTARY PUBLIC

TRISTAN LEIGH HARTLINE
Commission # HH 638783
Expires January 31, 2029

72

Dated: March 23, 2026

Respectfully submitted,


ROBIN WAGNER LAW, PLLC

*/s/ Robin B. Wagner*
Robin B. Wagner
Attorneys for Plaintiffs
402 W. Liberty Street
Ann Arbor, MI 48103
(734) 294-3035
robin@robinwagnerlaw.net


HURWITZ LAW PLLC

*/s/ Noah S. Hurwitz*
Noah S. Hurwitz (P74063)
Attorneys for Plaintiffs
340 Beakes St., Suite 125
Ann Arbor, MI 48104
(844) 487-9489
Noah@hurwitzlaw.com

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| HOPE HARBOR, a Michigan nonprofit corporation, BMAK CHARITY THRIFTS, a Michigan nonprofit corporation, MELISSA DESJARDIN,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF HILLSDALE, MICHIGAN,<br><br>Defendant. | Case No. _____<br><br>Hon. _____<br>United States District Judge<br><br>Hon. _____<br>United States Magistrate Judge |

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

Dated: March 23, 2026

Respectfully submitted,

ROBIN WAGNER LAW, PLLC

*/s/ Robin B. Wagner*
Robin B. Wagner
Attorneys for Plaintiffs
402 W. Liberty Street
Ann Arbor, MI 48103
(734) 294-3035
robin@robinwagnerlaw.net

HURWITZ LAW PLLC

*/s/ Noah S. Hurwitz*
Noah S. Hurwitz (P74063)
Attorneys for Plaintiffs
340 Beakes St., Suite 125
Ann Arbor, MI 48104
(844) 487-9489
Noah@hurwitzlaw.com

74